USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 5 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
SECURITIES AND EXCHANGE COMMISSION,   :
               Plaintiff,   :
:  12 Civ. 1230 (AJN)
-v-   :
:  MEMORANDUM &
:  ORDER
JOHN KINNUCAN AND BROADBAND RESEARCH   :
CORPORATION,   :
               Defendants.   :
:
-------------------------------------------------------------------X

     Before the Court is the Security and Exchange Commission's ("Plaintiff" or "SEC") motion for summary judgment against Defendants John Kinnucan, who proceeds *pro se*, and Broadband Research Corporation ("Broadband"). Dkt. No. 21. In particular, the SEC requests that the Court find that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5. The SEC further requests that Defendants be permanently enjoined from future violations of Section 10(b), ordered to disgorge profits with prejudgment interest, and subjected to the maximum civil penalty. For the reasons that follow the SEC motion is GRANTED in its entirety.

## I. BACKGROUND

     Broadband is a corporation based in Portland, Oregon, purportedly engaged "in the business of providing to its clients legitimate research about publicly traded technology companies." Pl. 56.1 Statement ¶ 6. From 2008 until November 2010, Kinnucan was the President of Broadband. *Id.* ¶ 7.

     Beginning in or around 2008, Kinnucan developed a relationship with an employee at the publicly traded company F5 Networks, Inc. ("F5"), who began to provide him with F5's gross

sales numbers in late 2009. Pl. 56.1 Statement ¶¶ 11-12; *see also* Watkins Decl. Ex. 3. On or about July 2, 2010, Kinnucan was informed "that F5 had generated better-than-expected financial results in its third quarter of fiscal year 2010." *Id.* ¶ 15. These results were not scheduled to be announced until July 21, 2010. *Id.*

Later that day, Kinnucan shared this information about F5's third quarter results with an analyst at Columbia Management Investment Advisors, LLC ("Columbia"), which covered 43,100 shares of a previously established short position in F5 stock that afternoon. Pl. 56.1 Statement ¶ 16; Watkins Decl. Ex. 8. On July 6, 2010, and July 15, 2010, Kinnucan spoke with a portfolio manager Carlson Capital, L.P. ("Carlson"), who purchased 99,000 shares of F5 stock prior to the announcement of the results on July 21, 2010. Pl. 56.1 Statement ¶¶ 15, 17; Watkins Decl. Ex. 7.

Following the close of trading on July 21, 2010, F5 announced third quarter revenues of $230.5 million, exceeding Wall Street analysts' consensus estimate by approximately $11 million. Pl. 56.1 Statement ¶ 18. The following day, F5's share price increased from $73.11 to $83.40, a gain of 14%. *Id.* As a result of having previously covered 43,100 shares, Columbia avoided $631,656.36 in losses. *Id.* ¶ 19; Watkins Decl. Exs. 8, 9. As a result of having previously purchased 99,000 shares, which were sold on July 22 and July 23, Carlson earned $951,789.60 in profits. Pl. 56.1 Statement ¶ 20; Watkins Decl. Exs. 6, 7. In total, Kinnucan's tippees' profits and avoided losses amounted to $1,583,445.96. Pl. 56.1 Statement ¶ 21.

On February 12, 2012, the United States filed an indictment against Kinnucan, charging him with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, based on the F5 trades described above. Pl. 56.1 Statement ¶ 23; Watkins Decl. Ex. 3. Kinnucan pleaded guilty to

these counts on July 25, 2012. Pl. 56. 1 Statement ¶ 25. At the time of his plea, Kinnucan made the following allocution:

> From approximately 2008 to 2010 I worked with others to obtain material nonpublic information from employees of public companies. I knew that the sources of this information had an obligation to keep the information confidential, but the sources gave me the information in exchange for personal benefits. I then passed along this information to clients in my own company, knowing they would use the information to make trading decisions. In particular, in July of 2010 I passed material nonpublic information to hedge fund clients in my company, including individuals located in New York City. We communicated by telephone and email. Based on the information I provided, two clients made purchases of [F5 stock] on July 2 and July 21, 2010. I knew at the time that what I was doing was wrong and illegal.

Pl. 56.1 Statement ¶ 27; Watkins Decl. Ex. 4, at 16.

Meanwhile, the SEC filed this parallel civil enforcement action on February 17, 2012. Dkt. No. 17. Neither Kinnucan nor Broadband ever responded to the SEC Complaint. *See* Watkins Decl. Ex. 2. The SEC subsequently filed this motion for summary judgment, which was also unopposed.

## II. DISCUSSION

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." "For purposes of summary judgment, there is a genuine issue of material fact if a reasonable factfinder could decide in the non-moving party's favor." *Arty v. N.Y.C. Health & Hospitals Corp.*, 09 Civ. 05982, 2013 WL 6246490, at *1 (S.D.N.Y. Dec. 3, 2013) (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)). "[T]he district court is not relieved of its duty to decide" whether this standard has been met when a motion for summary judgment is unopposed. *Vermont Teddy Bear Co., Inc. v. 1-800-Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004"Although the failure to respond may allow the district court to

accept the movant's factual assertions as true, *see* Local Civ. R. 56.2, the moving party must still establish that the undisputed facts entitle him to 'a judgment as a matter of law.'" *Id.* at 246 (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)).

Summary judgment may be granted against a pro se party who has filed no opposition if: (1) he "has received adequate notice that failure to file any opposition may result in the entry of summary judgment without trial;" and (2) "the Court is satisfied that 'the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law.'" *Orix Credit Alliance, Inc. v. Queen City Transp., Inc.*, No. 00 Civ. 2778 (NRB), 2001 WL 83236, at *2 (S.D.N.Y. Jan. 31, 2001) (quoting *Champion*, 76 F.3d at 485). The first requirement having been met by the SEC's compliance with Local Rule 56.2, the Court my grant Plaintiff's motion if the summary judgment standard is otherwise met. *See S.E.C. v. Rabinovich & Assocs.*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *1 n.1 (S.D.N.Y. Nov. 18, 2008).

B. Liability under Exchange Act § 10(b) and Rule 10b-5

Section 10(b) and Rule 10b-5 of the Exchange Act "generally prohibit fraud in connection with the purchase or sale of securities." *SEC v. Svoboda*, 409 F. Supp. 2d 331, 340 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5). "Insider trading—unlawful trading in securities based on material non-public information—is well established as a violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5." *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) (internal citations omitted). Liability for insider trading "is not confined to [those] who trade for their own account" but also reaches tippees who "know[] or should know that the information was received from one who breached a fiduciary duty" and yet uses the information to "trade[] or tip[] for personal benefit with the requisite scienter." *Id.* at 285 (citing *Dirks v. SEC*, 463 U.S. 646, 660 (1983)).

The SEC argues that Kinnucan is estopped from contesting liability under Section 10(b) and Rule 10b-5 on the basis of his guilty plea. Pl. Br. 7-8. The Court agrees. "It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978); *see, e.g., Svoboda*, 409 F. Supp. 2d at 339-40.

Based on his guilty plea, Kinnucan is estopped from denying that he offered employees of public companies personal benefits in exchange for confidential and "material nonpublic information" about their employers, which he "then passed along . . . to clients in [his] own company, knowing that they would use the information to make trading decisions." Def. 56.1 Statement ¶ 27. He is, in particular, estopped from denying that he received and relayed such nonpublic information in relation to Columbia and Carlson's July 2010 trades in F5 stock. *See id.* ("Based on the information I provided, two clients made purchases of [F5 stock] on July 2 and July 21, 2010."). Nor can it be disputed that Kinnucan acted with the requisite degree of scienter: as set forth in his allocution, for two years Kinnucan worked to obtain insider information to pass along to his clients, knowing "at the time that what [he] was doing was wrong and illegal." Pl. 56.1 Statement ¶ 27. It is therefore undeniable that Kinnucan obtained material nonpublic information from somebody he knew to have "breached a fiduciary duty" and knowingly relayed that information to his clients. *Obus*, 693 F.3d at 285. Plaintiff's motion for summary judgment is, accordingly, granted on the issue of Kinnucan's liability under Section 10(b) and Rule 10b-5.

The Court also agrees that Kinnucan's liability for these violations "is properly imputed to his company Broadband." Pl. Br. 9. "The misconduct of an agent . . . is imputed to the

corporation if committed within the scope of [his] employment." *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 471-72 (S.D.N.Y. 2010). Here, Kinnucan acted within the scope of his employment as Broadband's president by relaying the material nonpublic information to the company's clients. *Cf. SEC v. Lum's, Inc.*, 365 F. Supp. 1046, 1061 (S.D.N.Y. 1973) (imputing director and chief executive's acts to corporation). Accordingly, Plaintiff's motion for summary judgment is granted on the issue of Broadband's liability as well.

C. Requested Relief

The SEC requests three forms of relief: (1) permanent injunctions against future violations of the Exchange Act, (2) disgorgement of trading profits of Defendants' tippees, and (3) a civil penalty under Exchange Act 21A. Pl. Br. 9-10.

*1. Injunctive Relief*

The SEC seeks an order "permanently enjoin[ing] Kinnucan and Broadband from future violations of Section 10(b) of the Exchange Act." Pl. Br. 10. A permanent injunction against Kinnucan is necessary, the SEC argues, because "Kinnucan's criminal conviction demonstrates his conduct was flagrant and involved a high degree of scienter," involving "a business model founded on the passage of material nonpublic information to Broadband's high-paying clients," and because "Kinnucan . . . has not accepted any responsibility for his misconduct before the Commission." Pl. Br. 10-11. The SEC further argues that an injunction against Broadband is appropriate "not only because Broadband was the corporate vehicle through which Kinnucan perpetrated his scheme, but also because the Commission has no assurances from Kinnucan that Broadband will not seek to do business in the future." Pl. Br. 11.

Pursuant to Section 21(d)(1) of the Exchange Act, permanent injunctive relief is authorized when the SEC shows that "there is a substantial likelihood of future violations of

6

illegal securities conduct." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). In determining whether this standard has been met, the Court looks to the following factors:

> the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Id.* at 135 (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978)).

Having considered these factors, the Court finds that a permanent injunction against Kinnucan and Broadband is appropriate in this case. The fact of Kinnucan's criminal conviction, and particularly the nature of the underlying conduct—which unfolded over the course of two years and involved highly deliberate efforts to obtain insider tips and pass those tips on to paying clients—weigh strongly in favor of the injunction. *See Svoboda*, 409 F. Supp. 2d at 343 (stating that permanent injunctive relief is appropriate "where the fraud scheme at issue was broad in scope, long in duration, and involved a high degree of scienter"). Extending the injunction to Broadband is, additionally, justified by Kinnucan's role as president, and by the absence of any assurance that the company will restrain from future violations. Accordingly, the SEC's motion for summary judgment is granted with respect to this request.

### 2. Disgorgement and Prejudgment Interest

The SEC further requests that Kinnucan and Broadband be ordered to disgorge $1,583,445.96, "based on the profits and losses avoided as a result of the trades that Kinnucan's tippees made in F5 securities on July 2 and July 21, 2010 based on material nonpublic information." Pl. Br. 11-12. Holding the two defendants to be jointly and severally liable for this amount is appropriate, the SEC contends, because "Kinnucan and Broadband . . . are equally liable for the Exchange Act violations established here." Pl. Br. 12. For the reasons that follow, the Court agrees.

7

Disgorgement has the "primary purpose" of deterring future violations of the securities laws by forcing wrongdoers to give up ill-gotten gains, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1991) (citing *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)), including third party "gains [that] can be attributed to the wrongdoer's conduct," *SEC v. Contorinis*, -- F.3d --, No. 12-1723-cv, 2014 WL 593484, at *3 (2d Cir. Feb. 18, 2014). "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *First Jersey*, 101 F.3d at 1474-75 (2d Cir. 1996). The amount "may not exceed the amount obtained through the wrongdoing," *Contorinis*, 2014 WL 593484, at *2 (citing *Cavanagh*, 445 F.3d at 116 n.25), but should reasonably approximate the amount of "profits causally connected to the violation," *Svoboda*, 409 F. Supp. 2d at 344. (quoting *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995)). If the SEC demonstrates that the amount proposed is such a reasonable approximation, the burden shifts to the defendant to show that the profits were in fact less. *See id.* (internal citations omitted). This burden-shifting framework appropriately places "any risk of uncertainty in calculating the amount . . . on the wrongdoer whose illegal conduct created that uncertainty." *Id.* (quoting *Patel*, 61 F.3d at 140).

Disgorgement is an appropriate remedy in this case. Kinnucan and, through him, Broadband flagrantly obtained and shared insider information, and disgorgement is justified to deter similar misuse of insider information for the benefit of business associates. *See SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998). The Court further finds that $1,583,445.96 is a "reasonable approximation" of the amount "causally connected to the violation," *Svoboda*, 409 F. Supp. 2d at 344, as it reflects the $951,789.60 in profits made by Carlson and $631,656.36 in losses avoided by Columbia by virtue of the tips shared by Kinnucan, *see* Pl. 56.1 Statement ¶¶ 19-21. This amount is uncontested by Defendants, who have filed no opposition.

Defendants' "high degree of bad intent" further entitles the SEC to prejudgment interest, at the use of interest rate imposed by the Internal Revenue Service, on the amount to be disgorged. *Svoboda*, 409 F. Supp. 2d at 346 (granting prejudgment interest where the defendants' insider trading scheme lasted for several years, implicated many issuers, and "involved numerous forms of deceptive conduct"); *see also Contorinis*, 2014 WL 593484, at *8 (affirming that prejudgment interest may be appropriately awarded "[w]hether or not a party personally enjoyed the gains from the illegal action"). The Second Circuit has endorsed the use of the IRS underpayment rate in these situations, and the Court does the same here. *See First Jersey*, 101 F.3d at 1476.

Accordingly, the motion for summary judgment is granted with respect to the request for disgorgement and prejudgment interest. Furthermore, because Kinnucan was "clearly responsible for the activities" of Broadband, the Court finds that they are jointly and severally liable for the full amount of disgorgement and prejudgment interest. *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007).

### 3. Civil Penalty

Finally, the SEC requests that the Court impose upon Kinnucan and Broadband "the maximum three time penalty available under the law, $4,750,337.88." Pl. Br. 13. This severe sanction is warranted, according to the SEC, because "Kinnucan's conduct was egregious and involved a high degree of scienter." Pl. Br. 13-14.

The Court may assess civil penalties for insider trading pursuant to Section 21A of the Exchange Act, which states that "[t]he amount of the penalty . . . shall be determined . . . in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of" the conduct. 15 U.S.C. § 78u-1(a)(2). In making this determination, courts may

consider such factors as: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 433 (S.D.N.Y. 2011) (quoting *SEC v. Haligiannis*, 4700 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)).

As Kinnucan's conviction in the parallel criminal case demonstrates, his conduct was egregious, evinced a high degree of scienter, and involved recurrent conduct over a period of two years. *See* Watkins Decl. Ex. 4, at 16. Kinnucan, moreover, has not asserted or made any showing indicating that "the penalty should be reduced due to [his] demonstrated current and future financial condition." *Rajaratnam*, 822 F. Supp. 2d at 433.[1] Accordingly, the Court imposes against him $4,750,337.88 in civil penalties, or three times the profit gained or loss avoided because of his conduct. Again, because Kinnucan was responsible for the activities of Broadband, the Court further finds them to be jointly and severally liable for the amount of the penalty. *See Haligiannis*, 470 F. Supp. 2d at 385-87 (holding defendants jointly and severally liable for the amount of the civil penalty, where the individual defendant was "clearly responsible" for the wrongful conduct of the entity defendants).

---

[1] The Court inquired with the SEC whether it is appropriate to take into account information informally provided by Kinnucan's wife, who is not a party to this proceeding, or the fact that Kinnucan was represented by a federal defender in the parallel criminal proceeding. Dkt. No. 27. The Court agrees with the assertions in their letter response, Dkt. No. 28, and concludes that, these facts outside the record notwithstanding, Kinnucan has failed to make any showing regarding his financial condition.

## III. CONCLUSION

For the foregoing reasons, the SEC's motion for summary judgment is GRANTED. Within a week of the date of this order, the SEC is to submit to the Court a proposed judgment: (1) ordering disgorgement in the amount of $1,583,445.96; (2) setting forth its calculations of prejudgment interest to the date of this order and the per diem interest charge that shall be applied until the date judgment is entered; and (3) ordering a civil penalty of $4,750,337.88.

SO ORDERED.

This resolves Dkt. No. 21.

Dated: March 25, 2014
New York, New York

_____
ALISON J. NATHAN
United States District Judge